Filed 8/11/16  P. v. Reyes CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>CRISTIAN REYES,<br><br>    Defendant and Appellant. | B266108<br><br>(Los Angeles County<br>Super. Ct. No. TA132870) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Michael J. Shultz, Judge.  Affirmed as modified.

Emry J. Allen, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr. and Stacy S. Schwartz, Deputy Attorneys General, for Plaintiff and Respondent.

_____

In April 2014, defendant Cristian Reyes shot and killed Samuel Guzman. A jury found Reyes guilty of one count of first degree murder (Pen. Code, § 187, subd. (a)).[1] On appeal, Reyes contends: (1) the trial court erred in excluding evidence of pretrial statements Reyes made to a jailhouse informant and in a recorded telephone conversation with his girlfriend; both statements suggested he acted in self-defense; (2) he was improperly impeached with evidence of his prior convictions; and (3) the trial court erred in rejecting a jury instruction on voluntary intoxication. We find no reversible error, direct the trial court to correct the abstract of judgment, and otherwise affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

In the afternoon of April 8, 2014, Samuel Guzman entered the yard of the house where Reyes lived with his parents. Guzman was wearing a hat associated with the South Los gang.[2] Reyes and some of his associates had placed graffiti related to the Junior Mafia gang—a rival of South Los—on and around Reyes's family's house. Guzman entered the yard and paced. Reyes's mother saw Guzman as she was leaving the house. Reyes saw Guzman from an upstairs window of the house. Reyes grabbed a gun, went outside, and shot Guzman, hitting him with two bullets and killing him. Reyes then ran away. Guzman was unarmed. He had methamphetamine in his blood at the time of the shooting.

Police quickly found Reyes and the gun. They also recovered Reyes's wallet, which contained methamphetamine and $300. Reyes's jailhouse telephone calls to his girlfriend, Jenipher Mendoza, were recorded. In one call, Mendoza angrily accused Reyes of using drugs on the day of the shooting. Reyes denied this claim:

> "Mendoza: You're a stupid. I bet you were—that's the day you did that shit.
> "Reyes: I wasn't—
> "Mendoza: Even you were, no, you weren't. You were sober.
> "Reyes: I didn't—I didn't even touch it—
> "Mendoza: I know—don't make—you make me mad. Stop fucking denying it.

---

[1] All further statutory references are to the Penal Code unless otherwise noted.

[2] Law enforcement had no information indicating Guzman was in fact a South Los gang member.

2

"Reyes: I wasn't, babe. I swear, like, I barely had got it, babe. I barely had got it that day, babe. I barely, barely had got it, babe."

At trial, Mendoza admitted that during a different call she accused Reyes of being under the influence when he committed the crime. Reyes insisted he was sober and "just wasn't thinking." Mendoza testified she did not believe him. She opined he was using drugs at the time because when he used drugs he was paranoid and afraid.

In yet another recorded call, Reyes asked if Mendoza had told her brother, a Junior Mafia gang member, about the murder. Reyes asked what the brother said in response to the news. Reyes then told Mendoza he had previously talked to the brother, before the shooting. Reyes said he had wanted to "do some stupid shit," and he had "the urge." He told Mendoza he thought that was why "what happened happened . . . because I had the urge . . . . And that was my only chance because you know—like how I did it, babe, it was very gangster."

Reyes testified at trial. He admitting shooting Guzman. He testified that he used marijuana and methamphetamine. When he was arrested in April 2014, he was not using methamphetamine every day, but he was doing more methamphetamine than marijuana. He knew about the Junior Mafia gang because Mendoza's brothers were in the gang. Reyes thought Mendoza's brothers were "cool," but he never joined the gang.

According to Reyes, on the day of the shooting, he saw Guzman open the gate and enter the yard of his family's house. Reyes did not know Guzman. He thought Guzman was wearing gang-affiliated attire. Guzman was pacing in the yard and holding his belt or something under his shirt. Reyes grabbed a gun then went outside to see what Guzman was doing in the yard. He got the gun because he saw that Guzman was "kinda gang affiliated." He intended to use the gun to scare Guzman away, and also: "If I woulda went out there without it, I don't know if he had something or not . . . ."

Reyes asked Guzman what he was doing in the yard. Guzman responded, "This Vario South Los," then he walked toward Reyes, even though Reyes's gun was visible. Reyes explained how he was feeling at that moment: "Well, I'm feeling that he got something on him 'cause, I mean, if somebody showed me the gun that big, I mean, I

would run away, you know, if I don't have nothing." Once Guzman got "really close," Reyes raised the gun and shot him, discharging the weapon four times. Reyes then ran away because he was scared. Reyes testified he told Mendoza the shooting was "gangster style" because he wanted her to see that he could "be protective over her." Defense counsel elicited testimony that Reyes had suffered a prior conviction for possession of methamphetamine, and a 2009 conviction for unlawful intercourse with a minor.

On cross-examination, Reyes admitted he wanted to be a Junior Mafia gang member and he wanted to be respected like Mendoza's brothers who were gang members. When asked how he was going to earn the respect of Mendoza's brothers and other men they knew, Reyes said: "I guess by doing something." He agreed he felt he needed to do something to prove he was equally tough. He agreed "one of the things" would be shooting a South Los gang member. He admitted he wanted Mendoza's brothers to know what he had done for "bragging rights." He admitted that when he described having the "urge" to Mendoza, he meant the urge to "put in work" for the gang. The cross-examination also included the following colloquy:

"Q: But here you were in your house, and you just happened to have a loaded gun that your boss had paid you with. And here came a chance because a South Los gang member—at least you thought he was a South Los gang member—walked right onto your front yard; isn't that true?

"A: Yeah.

"Q: This was the perfect opportunity for you to prove yourself to show that you had the urge to put in work, and you were willing to carry it out; isn't that correct?

"A: Yeah.

"Q: Isn't it also, true, sir that when you came out and you were looking down the length of that—of your lot and could see him, you were in a position of relative safety. You had the house there. You could run inside. Whereas, he was out in the open pacing on the grass; isn't that correct?

"A: Yeah.

"Q: And, so, then when you came up on him when you fired those shots, you had the position of advantage. You had the chance, as you told [Mendoza] and [Mendoza's brother], to put in work and kill a South Los; isn't that correct, sir?

"A: Yes.

"Q: Isn't it true, Mr. Reyes, that you did not act in self defense? Isn't it true, sir, that you took a chance that had been given to you?

4

"A:  I mean, I didn't took [*sic*] a chance.  It's just, like I said earlier, you know, I didn't thought [*sic*] stuff like that was gonna happen, you know.  Like, it just—I wanted to scare this guy away.  To be honest, I did, and it didn't happen like that, you know. [¶] And I kinda, like, feel bad about it, you know, that it happened that way.  But, I mean, I couldn't—I mean, I was afraid of my protection, you know.  I was afraid that he could have shot me first before me shooting at him, you know."

The jury found Reyes guilty of first degree murder.  It also found true allegations that Reyes personally used a firearm within the meaning of section 12022.53, subdivision (b), and that he personally and intentionally discharged a firearm, causing death, within the meaning of section 12022.53, subdivisions (c) and (d).  The jury found a gang allegation not true.  The trial court sentenced Reyes to a total prison term of 50 years to life.  Reyes timely appealed.

## DISCUSSION

### I.  The Trial Court Did Not Err in Excluding Reyes's Pretrial Statements

On appeal, Reyes contends the trial court erred in excluding out-of-court statements he made to a jailhouse informant and to Mendoza.  We find no prejudicial error.

#### A.  Statements to Informant

While in jail, Reyes spoke to an informant who was placed in his cell.  Early in their conversation, after Reyes said the police had found the gun he used, police had a lot of evidence on him, and he claimed he was from the Junior Mafia gang, he said, in Spanish, "Can they hear us in here homie[?]"  However, he continued talking.  His statements to the informant included:  "[Guzman] ran up . . . with a strap . . . "; and "I had to do what I had to do fool, I just defended myself you know?"; "He was tryin' to kill me, dog.  He was basically—he was tryin' to kill me, dog, and I knew what I had to do.  I mean, hey"; and "I don't know.  He would have killed me, fool."

Before trial, defense counsel sought to introduce the conversation.  The People objected.  Defense counsel argued the exculpatory statements in the recording were not hearsay because he was not offering them to prove the truth of the matter asserted; for example, he was not attempting to use the statements as evidence that Guzman had a gun.

5

Counsel alternatively argued that if deemed hearsay, the statements were still admissible under Evidence Code section 1250, an exception to the hearsay rule for statements of a declarant's then existing state of mind. The trial court excluded the conversation as inadmissible hearsay.

Hearsay is "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200.) We review a trial court's decision to admit or exclude a hearsay statement for abuse of discretion. (*People v. Jones* (2013) 57 Cal.4th 899, 956.)

"Evidence of a declarant's statement is not hearsay if it relates facts other than declarant's state of mind and is offered to circumstantially prove the declarant's state of mind. (1 Jefferson, Cal. Evidence Benchbook (2d ed. 1982) § 1.5, p. 67.) However, a statement is hearsay if it directly asserts the declarant's state of mind and is offered to prove the declarant's state of mind. [Citation.] Such a hearsay statement is admissible only if it falls within an exception to the hearsay rule. (Evid. Code, § 1200, subd. (b).)" (*People v. Frye* (1985) 166 Cal.App.3d 941, 950-951.) Thus, for example, in *People v. Frye,* the defendant in a burglary case told the police he entered the burglarized home to look, not to steal. The Court of Appeal concluded the statement was properly excluded because it was a direct statement of the defendant's intent and was offered for the truth of the matter asserted. (*Id.* at pp. 950-951; see also *People v. Edwards* (1991) 54 Cal.3d 787, 818-821 [defendant's statements in a notebook and in an interview with police that he had headaches and did not remember anything about the shooting were hearsay not admissible under Evidence Code sections 1250 or 1251].)

Here, the trial court reasonably concluded Reyes's exculpatory statements in the recorded conversation with the informant were hearsay. The statements at issue were essentially Reyes telling the informant he shot Guzman in self-defense because he thought Guzman had a gun and was going to shoot him. These were not statements relating to facts other than Reyes's state of mind, offered only as circumstantial evidence of his state of mind at the time of the shooting. Instead, Reyes was telling the informant about his state of mind at the time of the shooting; he wanted to introduce the statements

6

at trial to prove his state of mind. As such, the statements were hearsay.[3] (See *People v. Douglas* (1990) 50 Cal.3d 468, 514, overruled on other grounds in *People v. Marshall* (1990) 50 Cal.3d 907, 933, fn. 4 [evidence of statement offered to prove truth of the matter stated in the statement by implication is hearsay].)

Moreover, even if the trial court erred in excluding some or all of the statements, we would find the error harmless under any standard. Reyes testified at trial and presented his self-defense claim. The jury also heard evidence explaining the gang graffiti at Reyes's house represented a gang that was a rival of the gang associated with Guzman's hat. Further, although Reyes told the informant he shot Guzman to defend himself, his own testimony was that he saw Guzman from an upstairs window and decided to grab a gun and confront Guzman, who, the evidence established, was unarmed. Reyes told Mendoza in recorded conversations that the shooting happened because he felt the urge to put in work for the Junior Mafia gang and the shooting was his only chance to do so. After the shooting, Reyes ran away and tried to hide the gun. On this evidence, we cannot conclude the trial court's exclusion of Reyes's conversation with the informant affected the verdict.

### B. Statements to Mendoza

Defendant also sought to admit a recorded conversation with Mendoza, which included the following colloquy:

"Mendoza: 'And no lie. Deep inside I feel this anger towards you because you fucked up my life. . . . Why would you do this to me?

"Reyes: I'm sorry, baby. It's because the nigga was gonna get me, babe. What the fuck?' "

---

[3]     As to Evidence Code sections 1251 and 1252, Reyes argues only that those provisions were inapplicable because the excluded statements were not hearsay. We have concluded the trial court did not abuse its discretion in finding the statements to be hearsay.

Reyes argued the conversation should be admitted under Evidence Code 356 because it was one of several conversations between Mendoza and Reyes and should be included in the interest of completeness. The trial court excluded the evidence, concluding the conversation was distinct from those the People sought to introduce. The challenged conversation occurred two days before the first recorded call the People intended to offer at trial. The court further reasoned there was nothing unclear about the conversations the People were introducing, and nothing in the challenged conversation clarified the calls being offered in the People's case. Reyes contends on appeal that this ruling was in error. We disagree.

"Evidence Code section 356 provides, in relevant part, that '[w]here part of [a] . . . conversation . . . is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party; . . . when a . . . conversation . . . is given in evidence, any other act, declaration, conversation, or writing which is necessary to make it understood may also be given in evidence.' 'The purpose of Evidence Code section 356 is to avoid creating a misleading impression. [Citation.] It applies only to statements that have some bearing upon, or connection with, the portion of the conversation originally introduced. [Citation.] Statements pertaining to other matters may be excluded.' [Citations.]" (*People v. Chism* (2014) 58 Cal.4th 1266, 1324.) The trial court's ruling under the provision is reviewed for an abuse of discretion. (*People v. Parrish* (2007) 152 Cal.App.4th 263, 274.)

The trial court did not abuse its discretion in concluding the conversation Reyes sought to introduce was not necessary to make his other conversations with Mendoza understood. Each call was a separate, distinct conversation. The calls the People proffered were independent of each other, and independent of the call Reyes sought to introduce. Each call could be understood without reference to the other calls. (*People v. Farley* (2009) 46 Cal.4th 1053, 1103.) "A court does not abuse its discretion when under Evidence Code section 356 it refuses to admit statements from a conversation or interrogation to explain statements made in a previous distinct and separate conversation." (*People v. Johnson* (2010) 183 Cal.App.4th 253, 287-288.) This is also

8

not a case in which the defendant made exculpatory and inculpatory statements in a single conversation. (*Ibid.*) Nothing about what the People proffered in the recorded calls was misleading. (*People v. Williams* (2006) 40 Cal.4th 287, 319.) Evidence Code section 356 did not provide a basis for the admission of the excluded recorded conversation with Mendoza. (*People v. Chism, supra,* 58 Cal.4th at pp. 1324-1325.)

## II. No Reversible Error With Respect to Reyes's Prior Convictions

Before Reyes testified, the trial court ruled, over a defense objection, that Reyes could be impeached with evidence he suffered a 2009 conviction for a violation of Penal Code section 261.5, unlawful intercourse with a minor. On direct examination, defense counsel elicited Reyes's testimony that he suffered the conviction. Defense counsel also elicited Reyes's testimony that he had suffered a prior conviction for possession of methamphetamine.

### A. The Unlawful Intercourse Conviction

On appeal, Reyes contends the trial court erred in allowing impeachment with the section 261.5 conviction. Reyes asserts the crime is not one of moral turpitude. Reyes acknowledges that in *People v. Fulcher* (1987) 194 Cal.App.3d 749, the court interpreted *People v. Hernandez* (1964) 61 Cal.2d 529, and section 261.5, as determining a section 261.5 conviction is a crime of moral turpitude. Reyes does not assert *Fulcher* was wrongly decided, and concedes *Hernandez* found unlawful intercourse with a minor to be a crime of moral turpitude. However, he essentially asserts that under contemporary mores, the crime should no longer be considered one of moral turpitude. We disagree and note we are also bound to follow the decision of our high court. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) The trial court properly concluded the conviction was for a crime of moral turpitude.

Reyes further argues that even if considered a crime of moral turpitude, the trial court should have exercised its discretion under Evidence Code section 352 to bar impeachment with the section 261.5 conviction. We find no abuse of discretion.

9

" ' "[T]he admissibility of any past misconduct for impeachment is limited at the outset by the relevance requirement of moral turpitude." ' [Citation.] Beyond this, the ' "trial courts have broad discretion to admit or exclude prior convictions for impeachment purposes." ' [Citation.] 'When determining whether to admit a prior conviction for impeachment purposes, the court should consider, among other factors, whether it reflects on the witness's honesty or veracity, whether it is near or remote in time, whether it is for the same or similar conduct as the charged offense, and what effect its admission would have on the defendant's decision to testify.' [Citation.]" (*People v. Edwards* (2013) 57 Cal.4th 658, 722.)

As explained above, unlawful intercourse with a minor involves moral turpitude. "[A]ny felony conviction evincing moral turpitude, as here, 'has some "tendency in reason" (Evid. Code, § 210) to shake one's confidence in [a witness's] honesty.' [Citation.]" (*People v. Campbell* (1994) 23 Cal.App.4th 1488, 1496.) The conviction was five years old—not excessively remote in time. Defendant concedes this factor was "at best neutral." Reyes also concedes the prior conviction was not similar to the charged offense. Moreover, Reyes testified in spite of his awareness that he could be impeached with the conviction. The trial court did not abuse its discretion in allowing impeachment with the conviction.

## B.     The Possession Conviction

Reyes also argues his counsel was ineffective for failing to object to impeachment with the conviction for possession of methamphetamine. This argument misconstrues the record; the conviction came in because defense counsel elicited testimony from Reyes about it, on direct examination. There was no discussion between the court and the parties about impeachment with a drug possession prior conviction.[4]

---

[4]     In fact, the trial court indicated that because Reyes's other prior convictions were all for "straight possession," the section 261.5 conviction was the only prior conviction the court was aware of that would be available for impeachment.

We thus limit our review to the contention that defense counsel was ineffective for introducing evidence of the conviction. On the record before us, we reject the argument.

" ' " 'In assessing claims of ineffective assistance of trial counsel, we consider whether counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and whether the defendant suffered prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome. [Citations.]' " ' [Citations.]" (*People v. Johnson* (2016) 62 Cal.4th 600, 653.)

As Reyes contends, the methamphetamine possession conviction was not a crime of moral turpitude and would not have been available for impeachment. (*People v. Castro* (1985) 38 Cal.3d 301, 317.) Still, "we cannot say ' " 'there simply could be no satisfactory explanation' " ' " for defense counsel's decision to elicit evidence of Reyes's prior drug possession conviction. (*People v. Johnson, supra,* 62 Cal.4th at p. 654.) Indeed, one tactical reason may have been to further inform the jury of Reyes's drug use and to bolster the theory that Reyes was under the influence when he shot Guzman. "In the present case, '[t]he claim fails in the context of this direct appeal because the record does not reveal whether counsel had a plausible tactical reason for not requesting the instruction' [citation], and defendant fails to show that there could be no conceivable reason for trial counsel" to elicit evidence of the drug possession prior conviction. (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1051-1052.)

## III. The Trial Court Did Not Err in Rejecting an Instruction on Voluntary Intoxication

Reyes argues the trial court erred in denying his request for an instruction on voluntary intoxication. We find no error.

" '[A] defendant is entitled to [a voluntary intoxication] instruction only when there is substantial evidence of the defendant's voluntary intoxication and the intoxication affected the defendant's "actual formation of specific intent." ' [Citations.]" (*People v. Verdugo* (2010) 50 Cal.4th 263, 295.)

11

The trial court properly concluded there was no substantial evidence entitling Reyes to a voluntary intoxication instruction. There was scant evidence Reyes was under the influence at the time of the shooting. In his own testimony, Reyes did not indicate that he was under the influence of drugs at the time of the shooting, and in his recorded jailhouse calls with Mendoza he insisted he was sober. Indeed, the only relevant evidence was that methamphetamine was found in his wallet, he used the drug in general, and Mendoza's speculation that Reyes was "drugged up," because he tended to act paranoid when under the influence. Even if this evidence was sufficient to show Reyes was intoxicated at the time of the shooting, there was no evidence that the voluntary intoxication affected his ability to formulate intent, premeditate, or deliberate. (*People v. Williams* (1997) 16 Cal.4th 635, 677-678; *People v. Marshall* (1996) 13 Cal.4th 799, 847-848.) The trial court properly declined to instruct on voluntary intoxication for lack of substantial evidence to support the instruction. (*People v. Memro* (1995) 11 Cal.4th 786, 868 ["A party is not entitled to an instruction on a theory for which there is no supporting evidence."].)

## IV.     The Abstract of Judgment Must Be Corrected

The abstract of judgment must be corrected to eliminate the notation indicating the trial court stayed a section 186.22 enhancement. As Reyes points out, although the enhancement was alleged, the jury found the allegation not true.

## DISPOSITION

The trial court is directed to prepare a corrected abstract of judgment deleting the reference to a Penal Code section 186.22, subdivision (b)(1)(C) enhancement, and to forward a copy to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.


                                                                    BIGELOW, P.J.

We concur:



            FLIER, J.                              GRIMES, J.

12